**UNITED STATES DISTRICT COURT
FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FREDERICK MASHACK**<br>316 E Street NE<br>Washington, D.C.; | Case No. |
| **KENNETH KATZ**<br>3411 Fessenden Street NW<br>Washington, D.C. 20008; | |
| **JEFFREY M. AITKEN**<br>1706 D Street SE<br>Washington, D.C. | |
| **ROBERT KNOX**<br>2700 Virginia Avenue NW<br>Washington, D.C. 20037 | |
| **RENEE LYNCH**<br>20518 Summersong Lane<br>Germantown, MD | |
| **MIKE LYNCH**<br>20518 Summersong Lane<br>Germantown, MD | |
| **PATRICK D. TISDALE**<br>3023 O Street NW<br>Washington, D.C. 20007; | |
| **SCOT MONTREY**<br>1212 E Street NE<br>Washington, D.C. 20002; | |
| **STEVE GROSS**<br>540 N Street SW<br>Washington, D.C. 20024 | |
| **RICHARD HENRY**<br>1820 Jarvis Avenue<br>Oxon Hill, Maryland 20745; | |
| **BRIAN LEVY**<br>1321 Florida Avenue NW | |

Washington, D.C. 20009

**PATRICK CRAIG MULDOON**
1071 Sinking Creek Road
Hoges Chapel, VA 24136;

**JAMES TRAINUM**
1639 Potomac Ave. SE
Washington, D.C. 20003

and,

**TERRI ALLYN THOMPSON**
6904 32nd Street NW
Washington, D.C. 20015;

Plaintiffs,

v.

**SALLY JEWELL**,
in her official capacity as Secretary, U.S. Department of the Interior,
1849 C Street, NW, Washington, D.C., 20240;

**U.S. DEPARTMENT OF THE INTERIOR**
1849 C Street, NW
Washington, D.C., 20240;

**JONATHAN JARVIS**,
in his official capacity as Director
United States Department of the Interior
National Park Service
1849 C Street NW
Washington, D.C. 20240;

**ROBERT A. VOGEL**
In his official capacity as Regional Director
United States Department of the Interior
National Park Service
National Capital Region
1100 Ohio Drive SW
Washington, D.C. 20242;

and,

**GOPAUL NOOJIBAIL**,
in his official capacity as Superintendent

2

Case 1:15-cv-02107-ABJ   Document 1   Filed 12/08/15   Page 3 of 20

| | |
|---|---|
| National Capital Parks East<br>1900 Anacostia Drive SE<br>Washington, D.C. 20020;<br><br>Defendants. | |

## Complaint for Declaratory Judgment and Injunctive Relief
### Introduction

1. Plaintiffs are seeking declaratory and injunctive relief for violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 - 4370d ("NEPA"), sections 106 and 110 of the National Historic Preservation Act (16 USC 470f and 470h-2, respectively), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").

2. Plaintiffs' claims are based, in large part, on the Park Service failure to adequately consider the environmental impact of closing Buzzard Point Marina and removing the marina-infrastructure on the environment. According to the letter issued by the Park Service dated August 31, 2015 Letter (hereinafter, the "August 31, 2015 Letter") (Exhibit 1) and the "Record Of Determination For A Temporary Closure Of Buzzard Point Marina Due To the Concession Being Discontinued and the Need To Conduct Facility Stabilization. Maintenance, and Safety Related Projects" dated September 3, 2015 (hereinafter, the "Record of Determination") (Exhibit 2). The August 31, 2015 Letter provides, in part:

   > *Buzzard Point Boatyard Corporation has operated the marina as an NPS concessioner for more than 50 years. Under its management, **<u>the marina earned "Clean Marina" status for environmentally-friendly operating practices</u>**, while managing the facility in a manner that not only served marina patrons and visitors well, but also provided support and assistance to the surrounding District of Columbia community. (Emphasis added.)*

3. In October 2015, the Park Service posted "National Capitol Parks East - Buzzard Point Marina closure Batch 1 (Added October 8, 2015)"[1], which included (1) a redacted copy of the August 31, 2015 Letter, (2) a copy of the "Record of Determination for a Temporary Closure of Buzzard Point Marina Due to the Concession Being Discontinued

---

[1] http://www.nps.gov/aboutus/foia/upload/BuzzardPointMaterialsForWeb_batch1_REDACTED.pdf

and the Need to Conduct Facility Stabilization, Maintenance, and Safety Related Projects" dated September 3, 2015[2] (the "Record of Determination"), and (3) a list of marinas, mechanics, and a surveyor. The Record of Determination states,

> *Pursuant to 36 CFR 1.5(a), National Capital Parks-East is temporarily closing Buzzard Point Marina effective January 1, 2016….*
>
> *This temporary closure is necessary because **on December 31, 2015, marina concession operations by Buzzard Point Boatyard Corporation will be discontinued and the marina closed**. Once closed, the park will begin removing marina-related infrastructure, conduct repair, maintenance and improvements, and implement certain safety and security measures…. Once the park's rehabilitation work at the marina site is finished, and **assuming necessary funding and staffing exists**, we anticipate that the area will be reopened to the public for limited recreational activities in the spring of 2016. (Emphasis added.)*

4. The Record of Determination does not reference the impact of removing marina-related infrastructure or the elimination of 90 boat slips from the waters of the District of Columbia. More important, there is no Record of Determination pursuant to 36 CFR 1.5 to address the actions by the Park Service to discontinue the marina concession operations by Buzzard Point Boatyard Corporation and close the marina closed effective December 31, 2015 (Record of Determination).

5. There is no evidence the Park Service reviewed any of the potential impacts in an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*. The Park Service simply made its summary determination available to the public via the Freedom of Information Act (FOIA) page on the Park Service website, without an opportunity to comment upon the proposed demolition of the marina-related infrastructure, conduct of repair, maintenance and improvements, or the implementation of certain safety and security measures; and, no opportunity at all to review the agency's findings that resulted in the Record of Determination. Further, neither the Environmental Protection Agency (the "EPA") nor the Park Service provided an opportunity for the public to appeal the determination, as would have been the case if the agency had conducted the assessment and published the findings.

---

[2] Complaint, Movants' Exhibit 2.

6. NEPA does for our natural environment what § 106 of the National Historic Preservation Act ("NHPA") does for sites of historical import. The Court has already noted the parallel:

   > *Both Acts create obligations that are chiefly procedural in nature; both have the goal of generating information about the impact of federal actions on the environment; and both require that the relevant federal agency carefully consider the information produced. That is, both are designed to insure that the agency "stop, look, and listen" before moving ahead.*

   *Pres. Coalition, Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982). <u>See also</u> *Morris County Trust for Historic Pres. v. Pierce*, 714 F.2d 271, 278-79 (3rd Cir. 1983).

7. The National Historic Preservation Act ("NHPA") became law on October 15, 1966, Public Law 89-665, and was codified in title 16 of the United States Code. Various amendments followed through the years. On December 19, 2014, Public Law 13-287 moved the NHPA's provisions from title 16 of the United States Code to title 54, with minimal and non-substantive changes to the text of the NHPA and a re-ordering of some of its provisions. While Public Law 13-287 did not repeal the NHPA's findings, for editorial reasons those findings were not included in the text of Title 54. The findings are still current law. However, rather than citing to the U.S. Code, when referring to the findings one may cite to: "Section 1 of the National Historic Preservation Act, Pub. L. No. 89-665, as amended by Pub. L. No. 96-515."

## Jurisdiction and Venue

8. This Court has jurisdiction under 28 U.S.C. § 1331 because the matter arises under the laws of the United States, including the Declaratory Judgment Act, 28 U.S.C. §§ 2201-22; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 et seq.; and the Administrative Procedure Act, ("APA"), 5 U.S.C. §§ 701-706.

9. Venue is proper in this Court under 28 U.S.C. § 1391(e) because a substantial part of the actions or omissions giving rise to these claims herein occurred in the District of Columbia, and Defendants conduct business related to the events or omissions alleged herein in the District of Columbia.

**Parties and Standing**

10. Plaintiffs are boat owners and friends of boat owners that lease a slip a slip for their boats at Buzzard Point Marina in Washington, D.C.  Plaintiffs have a long-standing interest in the preservation of access to the waterways of the District of Columbia and to affordable access to marina. Plaintiffs regularly engage in recreational activities at Buzzard Point Marina and on the Anacostia and Potomac Rivers, as well as the Washington Channel, including boating, sailing, bird watching, and aesthetic enjoyment.

11. The Park Service's actions in this case, if permitted, would unlawfully preclude Plaintiffs from using the Buzzard Point Marina, thereby reducing Plaintiffs' opportunity to boat, sail, and enjoy the Anacostia and Potomac Rivers. For this reason, the Park Service's challenged actions represent a direct threat to the interests of all Plaintiffs. Accordingly, the legal violations alleged herein cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs.

12. Plaintiffs' aesthetic, conservation, economic, recreational, scientific, educational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual, concrete injuries, traceable to Defendant' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

13. Defendant Sally Jewell is the United States Secretary of the Interior. In that capacity, Secretary Jewell has supervisory responsibility over the United States National Park Service. Defendant Jewell is sued in her official capacity.

14. Defendant Jonathan Jarvis is the Director of the National Park Service. In that capacity, Director Jarvis has supervisory responsibility over units of the National Park System, including National Capital Park East. Defendant is sued in his official capacity.

15. Defendant Robert Vogel is the Director of the National Capital Region. In that capacity, Director Vogel oversees 14 superintendents who manage more than 700 park locations in the District of Columbia, Maryland, Virginia and West Virginia. The region includes Buzzard Point Marina. Defendant is sued in his official capacity.

16. Defendant GoPaul Noojibail is the Superintendent of the National Capital Parks East. In that capacity, Superintendent Noojibail is responsible for the management and direction of several national parks in Washington, D.C., including Buzzard Point Marina. Defendant is sued in his official capacity.

## Legal Background

17. Plaintiff's primary claim in this lawsuit is straightforward: (i) the Park Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 et seq.; and the Administrative Procedure Act, ("APA"), 5 U.S.C. §§ 701-706; and Title 35 of the Code of Federal Regulations (CFR), particularly Part 1 and the Administrative Procedure Act; and, (ii) the Park Service's closure plan is arbitrary and capricious, and violates Plaintiffs' right to due process.

18. Under the Administrative Procedure Act, this court has the authority to hold unlawful and set aside an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C.A. § 706(2)(a).

**National Park Service Planning**

19. The Department of the Interior has developed extensive policy documentation which provides guidance to the National Park Service and its units. These documents include Management Policies 2006 (Exhibit 7), DO-12 Handbook (Exhibit 4), General Management Planning Dynamic Sourcebook (December 2009) (Exhibit 8), and the NEPA/NHPA Handbook[3] (Exhibit 5).

20. Pursuant to the Management Policies, park planning helps define the set of resource conditions, visitor experiences, and management actions that, taken as a whole, will best achieve the mandate to preserve resources unimpaired for the enjoyment of present and future generations" (Management Policies, Ch. 2). The National Park Service is tasked with using planning to bring logic, analysis, public involvement, and accountability into the decision-making process.

---

[3] The NEPA/NHPA Handbook (Exhibit __) provides advice on implementing provisions added to the Section 106 regulations in 1999 that address both "coordination" of the Section 106 and NEPA reviews and the "substitution" of the NEPA reviews for the Section 106 process (p. 4).

21. Park planning and decision-making is to be conducted as a continuous, dynamic cycle, from broad visions shared with the public to individual, annual work assignments and evaluations. As such, each park should be able to demonstrate to decision-makers, staff, and the public how decisions relate to one another in terms of a comprehensive, logical, and trackable rationale (Management Policies, 2.1.1).

22. Public participation in planning and decision-making ensures the Park Service fully understands and considers the public's interests in the parks. Accordingly, the Park Service will actively seeks and consults with existing and potential visitors, neighbors, scientists and scholars, concessioners, cooperating associations, other partners and government agencies, and others with ties to park lands works cooperatively with others to improve the condition of parks; to enhance public service; and to integrate parks into sustainable ecological, cultural, and socioeconomic systems (Management Policies, 2.1.3; See Cooperative Conservation Beyond Park Boundaries 1.6; Civic Engagement 1.7; Public Involvement 2.3.1.5; Consultation 5.2.1. Also see Director's Order #75A: Civic Engagement and Public Involvement).

23. The Policies further state:

> *"Members of the public—including existing and potential visitors, park neighbors, American Indians, other people with traditional cultural ties to lands within the park, concessioners, cooperating associations, other partners, scientists and scholars, and other government agencies—will be encouraged to participate during the preparation of a general management plan and the associated environmental analysis. Public involvement strategies, practices, and activities will be developed and conducted within the framework of civic engagement. (Whereas civic engagement is the philosophy of welcoming people into the parks and building relationships around a shared stewardship mission, public involvement—also called public participation—is the specific, active involvement of the public in NPS planning and other decision-making processes.)*

Management Policies, Chapter 2; General Management Planning Dynamic Sourcebook (Version 2.2, December 2009), Chapter 5 (Exhibit 8). Public involvement will meet NEPA and other federal requirements for identifying the scope of issues; developing the range of alternatives considered in planning; reviewing the analysis of potential impacts; and, disclosing the rationale for decisions about the park's future (Management Policies, 2.3.1.5).

24. Whenever groups are created, controlled, or managed for the purpose of providing advice or recommendations to the Park Service, the Park Service will first consult with the Office of the Solicitor to determine whether the Federal Advisory Committee Act requires the chartering of an advisory committee.  Consultation with the Office of the Solicitor will not be necessary when the Park Service meets with individuals, groups, or organizations simply to exchange views and information, or to solicit individual advice on proposed actions (Management Policies, 2.3.1.5; see Civic Engagement 1.7; Consultation 5.2.1. Also see NPS Guide to the Federal Advisory Committee Act. Also see Director's Order #75A: Civic Engagement and Public Involvement).

**National Environmental Policy Act**

25. Congress passed the National Environmental Policy Act ("NEPA") to "encourage productive and enjoyable harmony between man and his environment," and "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." Pub. L. No. 91-190, § 2, 83 Stat. 852 (1969) (codified at 42 U.S.C.A. § 4331, Sec. 101(a)).

26. NEPA requires all federal agencies to: 1) prepare in-depth studies of the impacts of and alternatives to proposed 'major federal actions; and 2) use the information contained in such studies in deciding whether to proceed with the actions; and 3) diligently attempt to involve the interested and affected public before any decision affecting the environment is made.  Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-Making (Exhibit 6).

27. According to the Park Service Management Policies 2006 (Exhibit 7), alternative futures for the park will be explored and assessed during general management planning and environmental analysis. Within the broad parameters of the park mission and mission goals, various approaches to park resource preservation, use, and development may be possible, some of which may represent competing demands for the same resource base. The general management plan will be the principal tool for resolving such issues. The range of alternatives will examine different combinations of management zoning, within the limits of laws, regulations, and policies governing national parks (Management Policies, 2.3.1.6).

28. According to the Management Policies, in most cases, an environmental impact statement (EIS) will be prepared for general management plans. In a few cases, the regional director, in consultation with the NPS Environmental Quality Division, through the Associate Director for Natural Resource Stewardship and Science, may approve an exception to this general rule if

   a. completion of scoping demonstrates that there is no public controversy concerning potential environmental effects; and,

   b. the initial analysis of alternatives clearly indicates there is no potential for significant impact by any alternative.

29. Where the NEPA and NHPA both apply, NEPA procedures will be used to inform the public about undertakings having the potential to affect properties listed on, or eligible for listing on, the National Register of Historic Places, consistent with the Advisory Council on Historic Preservation's regulatory provisions governing coordination with the National Environmental Policy Act and the Park Service nationwide programmatic agreement on section 106 compliance (36 CFR Part 800). The tiered approach to environmental analysis will be used as often as possible, in accordance with 40 CFR 1502.20 (Management Policies, 2.3.1.7; see Evaluating Impacts on Natural Resources 4.1.3; Planning 5.2. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making).

30. The Department of the Interior produced its NEPA regulations as Part 516 of its departmental manual (DM), and the National Park Service ("NPS" or "Park Service") produced several NEPA handbooks. Interior has also produced and continuously updates a series of environmental statement and compliance memoranda that further interpret Part 516 and need to be consulted in this process (DO-12 Handbook, §1.1). The handbook referred to as "DO-12 Handbook" (Exhibit 4) is an update and revision of DO-12, and it supersedes the 1982 version. "Although it is termed a handbook, most of the sections derive in whole or in part from the Council on Environmental Quality (CEQ) regulation or Interior NEPA guidelines, giving them the force of law. The processes described in [the DO-12 Handbook] are binding on all NPS personnel" (DO-12 Handbook §1.1(B)).

31. The environmental review process initiated with the passage of the NHPA ushered in a

new approach to Federal project planning. The passage of the National Environmental Policy Act of 1969 (NEPA) (P.L. 91-190; 83 Stat. 852; 42 U.S.C. 4321) in December 1969 and its subsequent signing into law on January 1, 1970, expanded environmental reviews and formally established environmental protection as a Federal policy. NEPA and NHPA require Federal officials to "stop, look, and listen" before making decisions that impact historic properties and the human environment. (NEPA/NHPA Handbook[4], p.4).

32. Where the documentation indicates that a project will have little or no impact, the agency may issue a Categorical Exclusion ("CE") (DO-12 Handbook, §3.0 et seq.). When a Categorical Exclusion is not appropriate and the agency has not determined that a proposed action has the potential to cause "significant environmental effects" requiring an Environmental Impact Statement (EIS), the agency prepares an Environmental Assessment (EA) (DO-12 Handbook, §1.2(B)). An EA is typically a concise public document that provides sufficient evidence and analysis for determining whether to prepare an EIS or Finding of No Significant Impact (FONSI) (NEPA/NHPA Handbook, p.21; 40 C.F.R. § 1508.9).

**National Historic Preservation Act**

33. Many actions taken by the National Park Service, unless categorically excluded from further NEPA analysis, require public involvement and analysis of alternatives. They also require compliance with the NHPA and related legislation. Although general management planning addresses key environmental quality and cultural resource issues at the programmatic level over the long term, resolution of resource issues must continue during implementation planning. This will generally be accomplished through the appropriate NEPA and NHPA section 106 compliance processes and the application of the tiered approach to environmental analysis (Management Policies, 2.3.4.1; see Park Management 1.4; Chapter 3: Land Protection; Chapter 4: Natural Resource Management; Chapter 5: Cultural Resource Management; Chapter 6: Wilderness Preservation and Management; Chapter 8: Use of the Parks; Chapter 9: Park Facilities; Chapter 10:

---

[4] The NEPA/NHPA Handbook (Exhibit 5) provides advice on implementing provisions added to the Section 106 regulations in 1999 that address both "coordination" of the Section 106 and NEPA reviews and the "substitution" of the NEPA reviews for the Section 106 process (p. 4).

11

Commercial Visitor Services. <u>Also see</u> Director's Orders #2: Park Planning; Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making (and the related Environmental Screening Form); Executive Order 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations)).

34. A property listed in or eligible for listing in the National Register of Historic Places qualifies as a historic property. The State identifies such properties through consultation with agency officials and other interested parties.

35. A property meets the eligibility requirements if it is, as here, "associated with events that have made a significant contribution to the broad patterns of our history," it is "associated with the lives of persons significant in our past," it "embod[ies] the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction," or it "ha[s] yielded, or may be likely to yield, information important in prehistory or history." 36 C.F.R. § 60.4(a)-(d).

36. The NHPA consultation process applies to parkland proposed for demolition of the marina related infrastructure and the closure of Buzzard Point Marina.

37. Generally, the State bears responsibility for conducting the review process before formal proposal submission to Park Service. The State Liaison Officer ("SLO") initiates the consultation process with the State Historic Preservation Office ("SHPO") and other consulting parties to define the Area of Potential Affect ("APE") and to determine whether the APE contains any historic properties. The SLO then recommends a determination of effect.

38. If the State determines that the APE contains no historic properties or properties eligible for listing on the National Register, or that the proposed action will not affect any qualifying properties within the APE, the State must provide adequate documentation of that determination to the SHPO and notify all interested parties that they have 30 days to comment on the finding.

39. When a project will have adverse effects on a qualifying historic property, the State should consider all feasible and practicable alternatives to avoid or beneficially incorporate the historic properties into the project.

40. The agency must provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. 36 C.F.R. 800.2 (5)(d)(2).

41. Park Service must give guidance to the State and conduct further consultation if necessary. The NPS cannot accept a LWCF proposal from the State for review until the State completes the Section 106 process.

42. The Park Service is ultimately responsible for determining whether a project proposal will affect a property in or eligible for listing on the National Register.

## Statement of Facts

43. Park Service is charged with performing a "discrete agency action." A "discrete agency action" is a "final agency action" under the APA. *In re Aiken County*, 645 F.3d 428, 437 (D.C. Cir. 2011) (quoting *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C.Cir. 2006)).

44. Here the Park Service unlawfully withheld such an action – namely failed to publish rulemaking in the Federal Register and to issue a Record of Determination as required by sec. 1.5(b) that addresses the elimination of the 90 boat slips that are listed in the Code of Federal Regulations, Title 36, Chapter 1, Superintendent's Compendium dated November 27, 2005(the "2005 Compendium") (Exhibit 12), or the requirement for slip holders to terminate existing leases and remove their boats.

45. Section 1.5 provides:

> *(b) Except in emergency situations, a closure, designation, use or activity restriction or condition, or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or <u>**significant modification in the resource management objectives of the unit, or is of a highly controversial nature, shall be published as rulemaking in the Federal Register**</u>.*
> *(c) Except in emergency situations, prior to implementing or terminating a restriction, condition, public use limit or closure, the superintendent shall prepare a written determination justifying the action. That determination shall set forth <u>**the reason(s) the restriction, condition,**</u>*

> ***public use limit or closure authorized by paragraph (a) has been established, and an explanation of why less restrictive measures will not suffice***, *or in the case of a termination of a restriction, condition, public use limit or closure previously established under paragraph (a), a determination as to why the restriction is no longer necessary and a finding that the termination will not adversely impact park resources. This determination shall be available to the public upon request.*
> *  *   *   *   *   **
> *(e) Except in emergency situations, the public will be informed of closures, designations, and use or activity restrictions or conditions, visiting hours, public use limits, public use limit procedures, and the termination or relaxation of such, in accordance with §1.7 of this chapter. (Emphasis added.)*

46. The Park Service substituted a document titled "Record Of Determination For A Temporary Closure Of Buzzard Point Marina Due To the Concession Being Discontinued and the Need To Conduct Facility Stabilization. Maintenance, and Safety Related Projects" (hereinafter, the "Record of Determination") for the sec. 1.5(c) determination. (Exhibit 2) The Record of Determination only addresses the "temporarily closing Buzzard Point Marina effective January 1, 2016". The Determination does not discuss the impact of the closure of the marina, the elimination of the 90 boat slips that are listed in the 2005 Compendium, or the requirement for the current slip holders to remove their boats.

47. BoatUS the nation's largest organization of recreational boaters, issued a letter to the Park Service (Exhibit 3), which references the already negligible access to the waters of the Potomac for District residents, and urges Park Service to reconsider its decision and work to maintain and improve Buzzard Point Marina. BoatUS further state:

> *Support for recreational facilities such as Buzzard Point Marina is an important component of President Obama's Great Outdoors Initiative (AGO). A key recommendation to come out of the President's initiative is the following (emphasis added):*
> > *Recommendation 2.1 — Support outdoor recreation access and opportunities on public lands by establishing a Federal Interagency Committee on Outdoor Recreation.*
> 
> *Despite the major opportunities for quality recreation, many participants in the AGO process observed that significant obstacles remain to outdoor recreation on public lands and waters.*
> *As a key participating agency in the Federal Interagency Council on Outdoor Recreation, charged with implementing the President's vision,*

14

> *we ask that NPS reconsider the decision regarding Buzzard Point Marina.*

48. The impact of the Park Service actions, if permitted, will eliminate 90 boat slip and cause existing lessees of the Buzzard Point Marina boat slips to permanently remove their boats. These circumstances require publication in the <u>Federal Register</u>. Thus, the Park Service violated 36 CFR §§1.5 and 1.7 and the Administrative Procedure Act. The Park Service closure plan is arbitrary and capricious, and violates Plaintiffs' right to due process.

49. The Park Service's closure of the marina, the elimination of the 90 boat slips, and therequirement for the current lessees of boat slips to remove their boats, if permitted, will cause significant, certain and actual irreparable harm to Plaintiffs, patrons of Buzzard Point Marina, and future patrons of Buzzard Point Marina. The District waters have an insufficient number of boat slips; and, by Park Service's own admission, slips for Buzzard Point Marina boat owners may not be available until boats at alternative marinas are moved (<u>see</u>, August 31, 2015 Letter, Exhibit 1).

50. The Park Service will suffer no cognizable injury from an injunction stopping the closure of Buzzard Point Marina, the elimination of the 90 boat slips, and the requirement lessees of the Buzzard Point Marina boat slips remove their boats; and, maintaining the *status quo* by continuing to allow patrons of Buzzard Point Marina, including Plaintiffs and similarly situated slip holders, to use the boat slips and appurtenant area. In fact, remanding this matter to the Park Service for further deliberation will only serve to provide an opportunity for the Park Service to observe the procedures required by law.

51. It is in the public interest to preserve the *status quo* while the Park Service reconsiders the proposed closing of Buzzard Point Marina in accordance with federal law and the policies of the Department of the Interior. Further, there is a public interest in allowing the public to comment on the proposed changes to Buzzard Point Marina. The Park Service states in the Record of Determination that the area will only reopen if there are sufficient funds and staff. The change in access to Buzzard Point Marina warrants an opportunity for public involvement to determine the recreational experiences and uses desired for the area in advance of the removing the docks.

## Claim

**Claim 1: Defendants' failure to prepare an adequate environmental analysis and denial of public access to information and participation in the decision making process violated the National Environmental Policy Act.**

52. Plaintiffs repeat and incorporate by reference all preceding paragraphs.

53. The Defendants violated NEPA by failing to complete an Environmental Assessment or EIS evaluating impacts to the human environment resulting from the destruction, if permitted, of Buzzard Point Marina.

54. The Defendants violated NEPA by denying the public an opportunity to review and comment on the impacts associated with the Marina destruction and closure, if permitted, and alternatives to it prior to approval.

55. The Defendants violated NEPA by failing to provide adequate public notice of the Defendants' approval of the discontinuation of a concession for marina services and closure of Buzzard Point Marina violated the NEPA and is arbitrary, capricious, and not in accordance with law, particularly 5 U.S.C. § 706(2)(a).

**Claim 2: The Defendants' failure to include the public in its analysis and improper limitation of the scope violated the National Historic Preservation Act (NHPA) Process.**

56. Plaintiffs repeat and incorporate by reference all preceding paragraphs.

57. The Defendants violated NHPA by failing to consult with the public on its determination that the discontinuation of a concession for marina services and closure of Buzzard Point Marina would have no impact on any historic properties.

58. The Defendants violated NHPA by failing to consider all feasible and practicable alternatives to avoid or beneficially incorporate the historic properties into the project.

59. The Defendants' violation of the NHPA process was arbitrary, capricious, and not in accordance with law, particularly 5 U.S.C. § 706(2)(a).

## PRAYER FOR RELIEF

Plaintiff requests that this Court:

1. Declare, pursuant to 28 U.S.C. § 2201, that Defendants have violated the the National Environmental Policy Act, the National Historic Preservation Act, and applicable

regulations as described above;

2. Vacate the Record of Determination and the August 31, 2015 Letter and all subsequent directives;

3. Remand this matter to Park Service and require Defendants to initiate a new approval process of the Buzzard Point Marina plans;

4. Award Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to the National Environmental Policy Act and the National Historic Preservation Act, and expert witness fees;

5. Award Plaintiff all other relief the Court deems just and proper.

Respectfully submitted this ___ day of December, 2015,

_____
Terri Allyn Thompson, Esquire
D.C. Bar No. 448817
6904 - 32nd Street NW
Washington, D.C. 20015
(202) 362-3363

UNITED STATES DISTRICT COURT
FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FREDERICK MASHACK, et al.,** <br> Plaintiffs, <br><br> v. <br><br> **SALLY JEWELL**, et al., | Case No. <br><br> *PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION* |

## ORDER

Upon Consideration of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, this ___ th day of December 2015, it be and hereby is

**ORDERED** that The Department of the Interior National Park Service (Park Service) transmitted a letter dated August 31, 2015 to inform the named Plaintiffs "that effective December 31, 2015, slip rental and marina concession operations at the Buzzard Point Marina will be discontinued and the marina will be closed" is null and void, and Defendants shall not attempt to remove Plaintiffs or their property from Buzzard Point Marina; and, it is further

**ORDERED** that Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to the National Environmental Policy Act and the National Historic Preservation Act, and expert witness fees.

IT IS SO ORDERED.

_____

U.S. District Court Judge

# UNITED STATES DISTRICT COURT
# FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FREDERICK MASHACK, et al.,** Plaintiffs, <br><br> v. <br><br> **SALLY JEWELL, et al.,** Defendants. | Case No. <br><br> *PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION* |

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 8th day of December, 2015, she caused one copy each of the foregoing Complaint, including memorandum in support and attachments, to be

served by electronic mail, and overnight mail on the following:

        **SALLY JEWELL**,
        Secretary, U.S.
        Department of the Interior,
        1849 C Street, NW
        Washington, D.C., 20240

        **U.S. DEPARTMENT OF THE INTERIOR**
        1849 C Street, NW
        Washington, D.C., 20240

        **U.S. NATIONAL PARK SERVICE**
        1849 C Street, NW
        Washington, D.C. 20240

        **JONATHAN JARVIS**,
        Director, U.S. National
        Park Service,
        1849 C Street, NW
        Washington, D.C. 20240

        **ROBERT A. VOGEL**
        Regional Director
        United States Department of the Interior

       National Park Service
       National Capital Region
       1100 Ohio Drive SW
       Washington, D.C. 20242

       **GOPAUL NOOJIBAIL**
       Superintendent
       National Capital Parks East
       1900 Anacostia Drive SE
       Washington, D.C. 20020

Respectfully submitted this ___ day of December, 2015,


_____
Terri Allyn Thompson, Esquire
D.C. Bar No. 448817
6904 - 32nd Street NW
Washington, D.C. 20015
(202) 362-3363