# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
FREDERICK MASHACK, *et al.*,      )
)
      Plaintiffs,      )
)
      v.      )      Civil Action No. 15-2107 (ABJ)
)
SALLY JEWELL,      )
in her official capacity as Secretary,      )
U.S. Department of the Interior, *et al.*,      )
)
      Defendants.      )
_____)

## <u>MEMORANDUM OPINION</u>

A group of boat owners who lease slips at Buzzard Point Marina, and several of their friends, have brought this action against the Department of the Interior and individual agency and Park Service officials, challenging the closure of the marina, a National Park Service facility. Am. Compl. [Dkt. # 41]. Plaintiffs have been informed that marina concessions services will be discontinued when the current concessioner's contract expires, and that they must move their boats, but they ask the Court to declare that the Park Service has a statutory obligation to continue to operate the Washington, D.C. site. *Id.* They contend that the Park Service has violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the National Historic Preservation Act (NHPA), 54 U.S.C. § 300101 *et seq.*; the National Park Service Concessions Management Improvement Act of 1998 (Concessions Act), 54 U.S.C. §§ 101524, 101911–101926; the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706; and its own regulations: 36 C.F.R. §§ 1.5 and 1.7. Am. Compl. ¶¶ 6, 81–100. The parties have filed cross-motions for summary judgment, and defendants have moved to dismiss some of plaintiffs' claims for lack of prudential standing and for failure to state a claim.

What plaintiffs seek is an order that would enable them to continue to dock their boats at the marina. They have derived considerable enjoyment from boating on the Potomac and Anacostia rivers for many years, utilizing the conveniently-located and well-priced facility at Buzzard Point that accommodates their small boats and provides the amenities they desire. Plaintiffs are understandably disappointed with the current state of affairs, and they wish to participate in the Park Service's planning process to ensure that it takes account of the longstanding use of Buzzard Point by a diverse and devoted boating community. And they are correct in their understanding that the ultimate disposition of the Park Service facility must comport with both federal environmental statutes and agency regulations.

But plaintiffs have advanced their claims in this case by conflating discrete decisions and events, misstating the significance and scope of particular record documents, and blurring the distinctions between separate statutory and regulatory regimes. When one disentangles the jumble of evolving legal theories that plaintiffs have put before the Court – as one must do to assess the validity of any individual claim – it becomes clear that the Park Service has acted in accordance with the law to date, and that many of the necessary steps have not yet been undertaken and are not yet subject to challenge.

More important, the Court cannot grant plaintiffs the remedy they seek – the right to stay at Buzzard Point – in the absence of a concessioner to operate the marina. The Court simply cannot force the government to solicit a new contract pursuant to the Concessions Act or any other statute, and that is really the beginning and end of plaintiffs' action for injunctive relief. For those reasons and the reasons set forth below, the count based on the Concessions Act will be dismissed, plaintiffs' motion for summary judgment on the other counts will be denied, and defendants' motion for summary judgment will be granted. But as the agency itself has acknowledged, the

Park Service will be required to engage in the applicable NEPA/NHPA analysis before disturbing the physical environment at the marina or closing it permanently, and it will need to generate an appropriate record in accordance with those statutes and its own regulations, including 36 C.F.R. § 1.5, as it moves forward with future plans for the location.

## BACKGROUND

### I.     Factual Background

Buzzard Point Marina is located at 2158 Half Street Southwest in Washington, D.C.  Mem. in Supp. of Defs.' Mot. for Summ. J. [Dkt. # 23] ("Defs.' Mem.") at 1.  The marina has been operated "for decades" by a Park Service concessioner, Buzzard Point Boatyard Corporation, *id.* at 6, most recently pursuant to Park Service contract CC-NACE003-06, which expired on December 31, 2011.  *See, e.g.*, Administrative Record ("AR")[1] 0343.  The contract was extended on three occasions, each time for a period of one year, culminating in a final extension through December 31, 2014.  AR 0122; AR 0269.  After that contract expired, Buzzard Point Boatyard Corporation continued to operate the marina under temporary concession contract TC-NACE003-15, which was set to expire by its own terms on December 31, 2015.  AR 0001–80.

Between 2013 and 2015, the Park Service considered several options for the continuation of concessions services at the marina, including combining Buzzard Point operations with the nearby James Creek Marina.  *See, e.g.*, AR 0244–47; AR 0338.  But Park Service employees expressed concerns about the long-term financial feasibility of the project and the costs of deferred maintenance at the site.  *See, e.g.*, AR 0125–28; AR 0244–47; AR 0338.  In July 2013, for example,

---

[1]     The Administrative Record in this matter was filed under seal in seven parts on January 15, 2016.  *See* AR [Dkt. ## 32-2, 32-3, 32-4, 32-5, 32-6, 32-7, 32-8].  Each page of the Administrative Record is stamped with a Bates number in the bottom right corner with the prefix "1:15-cv-02107" and a four-digit number.  The Court will use the four-digit numbers when citing to the pages of the Administrative Record in this Memorandum Opinion.

an inspection team observed that "[t]he [marina] grounds appeared to be well maintained," but "[t]he floating docks on the other hand have some issues," including soft spots, rotted pilings, inconsistent use of materials, and other safety hazards.  AR 0099.  In February 2014, the Park Service engaged third-party contractors to conduct a "comprehensive condition assessment" at the marina.  AR 0161–65.  The assessment found that the marina's dock structures were "in fair to poor condition," and that the marina infrastructure was in need of repair and maintenance.  AR 0163–65.

While the Park Service considered releasing a prospectus combining the Buzzard Point operations with another marina operation, *see* AR 0338; AR 0343, the agency decided in August 2015 not to solicit proposals for a new concessions contract for the facility.  *See* AR 0381–84 (Park Service letter to Buzzard Point Boatyard Corporation explaining that the agency has "decided not to continue marina concession operations at Buzzard Point Marina after the expiration of concession contract TC-NACE-003-15 on December 31, 2015" because "the condition of the marina facility warrants extensive improvements, but the cost is too great to make it a profitable business").

On August 31, 2015, the Park Service and Buzzard Point Boatyard Corporation sent a joint letter to marina slip holders, informing them that "effective December 31, 2015, slip rental and marina concession operations at the Buzzard Point Marina will be discontinued and the marina will be closed."  AR 0385.  The letter explained that "[p]ast concession contracts did not allow for any capital investment or improvements to be made at the marina," and that "the level of investment now needed makes this marina concession not financially feasible."  AR 0385.  For those reasons, the letter advised that "a new concession contract prospectus would not be advertised for the Buzzard Point Marina site."  AR 0385.  The letter stated that marina patrons had

until December 31, 2015 "to arrange to relocate their boats, trailers, and personal property," and it provided recipients with "a list of several area marinas and their current slip availability" to that end.  AR 0385; *see also* AR 0389.

On September 3, 2015, the Park Service issued a "Record of Determination for a Temporary Closure of Buzzard Point Marina Due to the Concession Being Discontinued and the Need to Conduct Facility Stabilization, Maintenance, and Safety Related Projects," pursuant to 36 C.F.R. § 1.5(a).  AR 0397 ("Record of Determination").  In that document, the Park Service reported that "on December 31, 2015, marina concession operations by Buzzard Point Boatyard Corporation will be discontinued and the marina closed."  AR 0397.  It explained that the marina would be temporarily closed as of January 1, 2016 "to ensure public health and safety while the area undergoes facility stabilization, maintenance, and safety related projects and activities," and that the removal of marina-related infrastructure would begin after the marina was closed.  AR 0397.  The agency concluded that less restrictive measures than a closure would not suffice, and it found that "[t]he closure is not of a nature, magnitude and duration that will result in a 'significant alteration in the public use pattern'" because the closure was of limited duration, other nearby parks would remain open, and "other adjacent marinas are open to the public and available to boaters."  AR 0397; *see also* Ex. 1 to Defs.' Notice to Ct. [Dkt. # 48-1] (map depicting the contiguous locations of Buzzard Point Marina and James Creek Marina); AR 0091 ("[T]here are six marinas in the immediate vicinity of Buzzard Point Marina, and another . . . approximately 5 miles downriver.").  Because the Park Service further determined that the temporary closure would not impair park resources and values and was not of a highly controversial nature, it concluded that publication as a rulemaking in the Federal Register was not necessary.  AR 0397.

In November 2015, as part of its NEPA compliance, the Park Service completed a "Categorical Exclusion Form" for a project entitled "Temporary Closure of Buzzard Point Marina," which explained that a temporary closure would be necessary to ensure public health and safety after marina concessions services terminated on December 31, 2015.   AR 0392 ("Categorical Exclusion Form").   The Park Service also prepared an "Assessment of Actions Having an Effect on Historic Properties" for the same project – the "Temporary Closure of Buzzard Point Marina" – finding that the temporary closure had no potential to cause any effects to historic resources.   AR 0394–96 ("Assessment of Effects Form").

## II.   Procedural History

On December 8, 2015, plaintiffs filed this lawsuit.   Compl. [Dkt. # 1].   The complaint was accompanied by a motion for a temporary restraining order and preliminary injunction to prevent the marina from being closed on December 31, 2015.   Pls.' Mot. for TRO & Prelim. Inj. [Dkt. # 2]. Plaintiffs challenge the decision not to solicit a new concessions contract for marina services at Buzzard Point, the temporary closure of the marina, and the planned removal of the marina infrastructure.   Am. Compl.

On December 9, 2015, the Court held a teleconference with the parties and consolidated the emergency motions with the merits pursuant to Federal Rule of Civil Procedure 65(a).   Min. Order (Dec. 9, 2015).   On December 11, 2015, defendants notified the Court that the Park Service had reached an agreement with the Buzzard Point Boatyard Corporation "to temporarily renew concessionary management services for the Buzzard Point marina for a period from January 1, 2016 through February 29, 2016."   Defs.' Notice to Ct. [Dkt. # 6] at 2.   The Court then denied plaintiffs' motion for a temporary restraining order as moot and set a schedule for the expedited

consideration of plaintiffs' claims on the merits within that time frame.  Min. Order (Dec. 14, 2015).

On January 11, 2016, defendants filed their motion for summary judgment.  Defs.' Mot. for Summ. J. [Dkt. # 23].   On January 27, 2016, plaintiffs filed a motion for leave to file an amended complaint, seeking to assert a new claim under the Concessions Act, Pls.' Mot. to Amend Compl. [Dkt. # 35], and they also filed a combined cross-motion for summary judgment and opposition to defendants' motion.  Pls.' Mot. for Summ. J. [Dkt. # 36].  Defendants opposed the motion for leave to amend, arguing that amendment would be futile because the Concessions Act claim would not survive a motion to dismiss and should be denied as a matter of law.  Defs.' Opp. to Pls.' Mot. for Leave to Amend Compl. [Dkt. # 39] ("Defs.' Opp.").

The Court granted plaintiffs' motion for leave to amend on February 3, 2016.  Min. Order (Feb. 3, 2016).  However, because defendants did not have the opportunity to address the newly-added Concessions Act count in their motion for summary judgment, the Court permitted defendants to move to dismiss that claim pursuant to Federal Rule of Civil Procedure 12(b)(6) as part of their reply and opposition to plaintiffs' cross-motion for summary judgment, incorporating the opposition to the motion for leave to amend by reference.  *Id.*

On February 5, 2016, defendants filed a reply in support of their motion for summary judgment, an opposition to plaintiffs' cross-motion, and a motion to dismiss for lack of prudential standing and for failure to state a claim.  Defs.' Reply in Supp. of Defs.' Mot. for Summ. J. & Cross-Opp. to Pls.' Mot. for Summ. J. & Defs.' Mot. to Dismiss [Dkt. # 43] ("Defs.' Mot. to Dismiss").  And on February 9, 2016, plaintiffs opposed defendants' motion to dismiss and filed a reply in support of their cross-motion for summary judgment.  Pls.' Reply in Supp. of Pls.' Mot. for Summ. J. & Opp. to Defs.' Mot. to Dismiss [Dkt. # 45] ("Pls.' Reply").

The Court held a hearing on the motions on February 11, 2016.  Min. Entry (Feb. 11, 2016); Draft Tr. of Hr'g, *Mashack v. Jewell*, No. 15-2107 (D.D.C. argued Feb. 11, 2016) ("Draft Hr'g Tr.").  The parties also submitted post-hearing memoranda.  Defs.' Notice to Ct. [Dkt. # 48]; Pls.' Mem. of P. & A. in Supp. on APA [Dkt. # 49] ("Pls.' Post-Hr'g Suppl.").

## STANDARD OF REVIEW

### I.      Motion to Dismiss

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678, citing *Twombly*, 550 U.S. at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*, quoting *Twombly*, 550 U.S. at 556.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in the plaintiff's favor, and the Court should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C.

Cir. 2002).  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## II.      Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, Rule 56 does not apply to cases arising under the Administrative Procedure Act ("APA"), in light of a court's limited role in reviewing the administrative record.  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).  Under the APA, it is the agency's responsibility to resolve the factual issues and arrive at a decision that is supported by the administrative record, and the court is left to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  But this is a narrow scope of review.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's decision is presumed to be valid, *see Citizens to Preserve*

*Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.   A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks omitted).

## ANALYSIS

The amended complaint consists of four claims.   In Count I, plaintiffs allege that defendants violated the National Environmental Policy Act by failing to prepare an adequate environmental analysis for, and to involve the public in, the "destruction and closure, if permitted," of Buzzard Point Marina, and by failing to provide adequate public notice of the Park Service's "approval of the discontinuation of a concession for marina services."   Am. Compl. ¶¶ 82–84.   In Count II, they maintain that defendants violated 36 C.F.R. §§ 1.5 and 1.7 and the Administrative Procedure Act by failing to publish notice of the decision to permanently remove the boat slips at Buzzard Point Marina in the Federal Register.   *Id.* ¶ 85.   In Count III, plaintiffs contend that defendants' failure to maintain a concessions contract for marina services at Buzzard Point is a violation of the National Park Service Concessions Management Improvement Act. Am. Compl. ¶¶ 89–91.   And in Count IV, plaintiffs allege that defendants violated the National Historic Preservation Act by failing to consult with the public and consider all plausible alternatives prior to reaching the determination that marina services at Buzzard Point should be discontinued and the marina closed.   *Id.* ¶¶ 95–97.

Plaintiffs' claims in this matter boil down to their desire to keep their boats at Buzzard Point Marina, and one can understand why they hope to extend the particular boating experience they have enjoyed for several decades.   But in their effort to obtain relief, plaintiffs ask the Court

to view several discrete actions taken by the Park Service in combination, including some that are not yet sufficiently final to permit judicial review.  Despite plaintiffs' assertions to the contrary, the Park Service's decisions to forego the solicitation of a new concessions contract, to close the marina temporarily, and to remove the marina infrastructure are severable, and each must be separately examined for compliance with the relevant statutes and regulations.  And upon review of those decisions, the Court concludes that neither the Concessions Act, NEPA, the NHPA, nor the APA provide grounds to challenge the contracting decision; that the Park Service complied with NEPA, the NHPA, and 36 C.F.R. §§ 1.5 and 1.7 in temporarily closing the marina; and that the issue of the agency's compliance with law in connection with the removal of marina infrastructure and any permanent closure is not yet ripe.  Thus, plaintiffs' motion for summary judgment will be denied and defendants' motions – with the exception of the motion to dismiss the environmental claims on standing grounds – will be granted.

I.     **Plaintiffs have alleged sufficient interests in continued operations at the Buzzard Point Marina to confer prudential standing and to state a claim under NEPA.**

The Court begins with defendants' motion to dismiss plaintiffs' NEPA claims in Count I for lack of prudential standing.  Defendants contend that "[p]laintiffs' interest in continuing the concession contract at the marina does not fall within the zone of interests that NEPA was intended to protect."  Defs.' Mot. to Dismiss at 2.   While plaintiffs' asserted recreational and aesthetic interests relate more to boating generally than to the continuation of operations at the Buzzard Point Marina in particular, and their allegations of potential environmental harms are conclusory and speculative, the Court finds that they have shown just enough to fall within NEPA's zone of interests.  Thus, defendants' motion to dismiss Count I on those grounds will be denied.

Plaintiffs assert that they "have a long-standing interest in the preservation of access to the waterways of the District of Columbia and to affordable access to marina services."  Am. Compl.

¶ 9.  They state that they "regularly engage in recreational activities at Buzzard Point Marina and on the Anacostia and Potomac Rivers, as well as the Washington Channel, including boating, sailing, bird watching, and aesthetic enjoyment."  *Id.*  Plaintiffs maintain that permitting the Park Service to close Buzzard Point Marina would "reduc[e] Plaintiffs' opportunity to boat, sail, and enjoy the Anacostia and Potomac Rivers, particularly the opportunity to enjoy the vistas from their marina slip and observe and preserve marine/wild-life by providing a place for birds and other marine/wild-life to nest, feed, and seek refuge from predators."  *Id.* ¶ 10.  Plaintiffs' declarations couple these broad sentiments with statements that underscore the significance of the "affordable" nature of the Buzzard Point services.  *See e.g.*, Decl. of Kenneth Katz in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 36-1] ("Katz Decl.") ¶ 14 ("[A] slip appropriate to the size and nature of my sailboat leased at James Creek Marina costs 50% more than my current Buzzard Point Marina slip."); Aff. of Steve Gross in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 36-2] ¶ 3 ("I have . . . a long-standing interest in . . . access to affordable boating."); Aff. of Jeffrey M. Aitken in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 36-3] ¶ 11 ("The costs associated with relocating my boat to another marina (in Maryland) are substantial.").  And they highlighted that aspect of their concerns at oral argument as well:  "[i]t is cost prohibitive for some of these [plaintiffs] to move their boats."  Draft Hr'g Tr. 17:12–13.

Defendants do not challenge plaintiffs' standing to invoke the Court's subject matter jurisdiction under Article III.  But "[i]n addition to constitutional standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim," *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015), and "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.*, quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014).

The Court of Appeals emphasized in *Gunpowder Riverkeeper* that "[t]he zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone." *Id.* at 274, citing *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000). "To be sure, a [party] is not disqualified from asserting a claim under the NEPA simply because it has an economic interest in defeating a challenged regulatory action." *Id.*, citing *Realty Income Trust v. Eckerd*, 564 F.2d 447, 452 (D.C. Cir. 1977) ("[A] party is not precluded from asserting cognizable injury to environmental values because his 'real' or 'obvious' interest may be viewed as monetary."). But a party "must assert an environmental harm in order to come within the relevant zone of interests," *id.*, citing *Eckerd*, 564 F.2d at 452 & n.10, and that zone of interests "does not encompass monetary interests alone." *Id.*, quoting *Eckerd*, 564 F.2d at 452 n.11. So plaintiffs' economic interests alone are insufficient to bring them within the zone of interests that NEPA was intended to protect.

Plaintiffs also maintain that they have an interest in "access to the waterways of the District of Columbia" and the "opportunity to boat, sail, and enjoy the Anacostia and Potomac Rivers," Am. Compl. ¶¶ 9–10, but those interests are not threatened by the Park Service's challenged actions here. The agency's decision-making documents – the Record of Determination, the Categorical Exclusion Form, and the Assessment of Effects Form – speak only of a temporary closure of Buzzard Point, and they do not purport to affect any other nearby marina or restrict access to or sailing on the Anacostia and Potomac Rivers in any way. *See* AR 0392; AR 0394–97. The fact that plaintiffs may have difficulty storing their boats nearby because "many of [their] boats are of a type and size that will not be accepted at other marinas," Draft Hr'g Tr. 17:5–7, is not an injury to plaintiffs' ability to experience the water in general, or an injury that was caused by the Park Service. So, plaintiffs' general recreational interests in boating and sailing along the

13

waterways adjacent to the marina are similarly insufficient to confer prudential standing under NEPA. *See, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) ("Prudential standing . . . like Article III standing, focuses in part on causation.").

In the end, though, applying the authority that is binding in this Circuit leads to the conclusion that plaintiffs have, if just barely, asserted sufficient environmental and recreational interests in the marina itself to bring themselves within the zone of interests protected by the NEPA statute. They proclaim an interest in observing the particular views available once they are docked at their assigned marina slips at Buzzard Point, and in enjoying the wildlife that has occasionally taken up residence on or around the docks, and they hypothesize that the animal habitat may be disturbed by the eventual removal of the marina infrastructure. *See* Am. Compl. ¶ 10 (stating that the marina closure would reduce plaintiff's "opportunity to enjoy the vistas from their marina slip"); Draft Hr'g Tr. 18:10–15 ("[T]here was a bird that nested on one of the boats and the . . . members of the community . . . appreciated the [bird] as it nested on the [dock] . . . and there was this additional member of the community for that spring."); Katz Decl. ¶¶ 10–11 (noting that "[d]ucks and other waterfowl are known to roost and nest in and near the docks, which the Service proposes to remove," and positing that removing the docks at the marina would "disturb[] the Anacostia River bed with unknown consequence to the riverbed itself, as well as the animals and plants in the area").

While plaintiffs' stated interests in their "vistas" are not weighty, and their fears of potential environmental harm to wildlife habitat are vague and speculative, the D.C. Circuit has found that "aesthetic and environmental interests in the quality of public lands where [a plaintiff] hikes, camps, [or] fishes" are "qualifying ones" for the purposes of NEPA. *Mountain States Legal Found.*

*v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996).  Applying that principle, defendants' motion to dismiss for lack of prudential standing will be denied.

## II.   Plaintiffs have failed to state a cognizable claim under the Concessions Act.

Defendants have also moved to dismiss Count III for failure to state a claim under Rule 12(b)(6).  Defs.' Opp. at 2–4; Defs.' Mot. to Dismiss at 1 n.1, 3.  In Count III, plaintiffs claim that the Park Service's failure to extend or reissue a concessions contract for Buzzard Point Marina violated the Concessions Act.  Am. Compl. ¶¶ 89–91.[2]  Defendants argue that the Act imposes no affirmative obligation on the Park Service to provide for concession services at the marina or any other park, and that the Act only serves to *limit* the Park Service's authority to award concessions contracts.  Defs.' Opp. at 2–4; Defs.' Mot. to Dismiss at 3.  The Court agrees, and for that reason, Count III fails on its face.

### A.   The Concessions Act does not impose a duty on the Park Service to maintain a concessions contract for marina services at Buzzard Point.

Plaintiffs insist – with no legal support – that the Concessions Act requires the Park Service to maintain a concessions contract for marina services at Buzzard Point, and that the agency's decision to let the current temporary concessions contract expire without soliciting a new contract violated that statute.  Am. Compl. ¶¶ 89–91; Mem. in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 36] ("Pls.' Mem.") at 21–27.  They point to the preamble to section 101913, which states:

> In furtherance of the findings and policy stated in section 101912 of this
> title, and except as provided by this subchapter or otherwise authorized by
> law, the Secretary shall utilize concession contracts to authorize a person,

---

2      The Concessions Act was originally codified at 16 U.S.C. § 5951 *et seq.*, but that enactment was repealed, and the Act is now codified at 54 U.S.C. §§ 101524, 101911–101926.  Plaintiffs cite to the repealed version of the statute.  *See* Am. Compl. ¶ 89–91; Mem. in Supp. of Pls.' Mot. for Summ. J. [Dkt. # 36] ("Pls.' Mem.") at 21.

corporation, or other entity to provide accommodations, facilities, and services to visitors to System units.

54 U.S.C. § 101913.

Notwithstanding plaintiffs' repeated emphasis of the word "shall," *see e.g.*, Pls.' Resp. to Defs.' Opp. [Dkt. # 40] at 4; Pls.' Reply at 10, one simply cannot read this provision to create a duty to enter into any particular contract. It does not mean anything other than *if* the Secretary is going to authorize a person to provide facilities or services, she must utilize concession contracts *in order to* do it. In other words, concession contracts are the required *means* by which the Secretary may exercise her discretion to confer that authority.

Indeed, the statute is explicit on that point – in a provision entitled "Authority of the Secretary not limited," Congress declared:

> Nothing in this subchapter shall be construed as limiting the authority of the Secretary to determine whether to issue a concession contract . . . .

54 U.S.C. § 101913(10).

Despite the unambiguous nature of that provision, plaintiffs also direct the Court to section 101912, Congress's findings and declaration of policy for the Act:

> It is the policy of Congress that the development of public accommodations, facilities, and services in System units shall be limited to accommodations, facilities, and services that –
>
> (1) are necessary and appropriate for public use and enjoyment of the System unit in which they are located; and
>
> (2) are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the System unit.

54 U.S.C. § 101912(b).

It is impossible to read this section as anything other than a limitation on the Secretary's discretion to approve development within the parks, but plaintiffs contend that it also conversely

restricts the agency's ability to discontinue a service that was previously offered.  Specifically, they argue that this provision, combined with section 101913, required the Park Service to make a formal determination "that visitor services at Buzzard Point Marina, particularly marina services, are no longer necessary and appropriate for public use and enjoyment" before it could decide not to solicit a new contract for those services after the existing concessions contract expired.  Pls.' Mem. at 21; *see also* Pls.' Reply at 9–16.

But the text of the Concessions Act does not support plaintiffs' interpretation.  The statute does not require the Park Service to award concessions contracts for all facilities that might be necessary and/or appropriate to enhance the public use and enjoyment of the nation's parks; in fact, it does not require the Park Service to award concessions contracts for *any* facilities.  *See* 54 U.S.C. § 101913(10).  The Act provides that *if* the Park Service chooses to develop facilities or accommodations within land set aside as a national park, it may *only* offer those services that are necessary and appropriate, and it must utilize concessions contacts to do so, pursuant to the limitations imposed by the statute.  *See* 54 U.S.C. § 101912(a) ("[P]ublic accommodations, facilities, and services that have to be provided within those System units should be provided only under carefully controlled safeguards against unregulated and indiscriminate use . . . ."); *id.* § 101912(b) ("[T]he development of public accommodations, facilities, and services in System units shall be limited to [those] that (1) are necessary and appropriate for public use and enjoyment . . . and (2) are consistent . . . with the preservation and conservation of the resources and values of the [Park] System unit.").

The Ninth Circuit came to a similar conclusion in *Canyoneers, Inc. v. Hodel*, 756 F.2d 754 (9th Cir. 1985), a case in which a concessioner challenged the Park Service's failure to renew its permit to sell hiking gear inside a national park.  *Id.* at 756.  The plaintiff pointed to the statutory

preference for existing concessioners contained in the Concessions Policy Act of 1965, 16 U.S.C. § 20d, the precursor to the Concessions Act of 1998, and it argued that "unless the Secretary determines that the services are no longer necessary, the preference entitles current satisfactory concessioners to renewal." *Id.* at 758. The Ninth Circuit rejected the plaintiff's reading of the statute, finding that it was "not entitled to a renewal of its permit," and instead, that it was only if the Park Service "chooses" to issue a new contract or permit covering the same concession services, that the existing concessioner's right of preference would arise. *Id.*

As in the *Canyoneers* case, the Park Service cannot be obligated to continue to offer services at Buzzard Point in perpetuity simply because it once found it necessary and appropriate to do so. The Court concludes that it is well within the statutory discretion of the Secretary to decide whether to award another concessions contract at the site or not. *See* 54 U.S.C. § 101913(10).

Plaintiffs point to fact that in 2013, agency officials prepared a draft "Necessary and Appropriate Determination" justifying a cessation of marina services at Buzzard Point. Pls.' Reply at 14, citing AR 0087–94. That document includes a statement that the Park Service "does not plan to issue a prospectus for a new service for Buzzard Point Marina, as based on this determination, the services is [sic] no longer necessary and appropriate." AR 0091. Plaintiffs maintain that this draft document, which was never signed or otherwise finalized, shows that "the Park Service knows it should have made a Necessary and Appropriate Determination with regard to its decision to discontinue marina services at Buzzard Point Marina." Pls.' Reply at 14. The Park Service responds that while a necessary and appropriate analysis "could be a helpful framework to analyze whether it makes sense to go on" with concessions operations, "it's certainly not required" by the statute. Draft Hr'g Tr. 73:23–74:1. The Court agrees, and the idea that the

agency utilized that approach in a draft several years ago is not enough to create a requirement that does not appear – and is expressly rejected – in the Act itself.  Moreover, the draft could simply be read as an effort to memorialize a decision that the agency could not move forward with a new contract solicitation because it could not make the predicate finding that the service *was* necessary – not as any sort of acknowledgement that a decision not to more forward requires a finding that it is no longer necessary.[3]

Plaintiffs also point to evidence in the Administrative Record that at one time, the Park Service contemplated continuing concessions services at Buzzard Point beyond the expiration of the temporary contract.  *See* Pls.' Mem. at 22, citing AR 0270–77 and AR 0343.  But the fact that

---

[3]     The text of the draft determination supports this reading:

> 1.  What is the legislative background, and subsequent regulations and policy, which would affect the implementation of this service, including the park's enabling legislation?

> There is no legislative mandate for the Buzzard Point Marina visitor service. It was authorized as a necessary and appropriate commercial visitor service under Concession Permit 14-6-960-471 in 1969 and under concession contracts afterwards.  The current operator has provided service since 1986, currently under contract NACE003-06, expiring originally on December 31, 2011 but extended until December 31, 2013.

> * * *

> 9.  Considering all of the above, does management consider the proposed service necessary and appropriate, and worthy of additional consideration?

> We believe the cost of replacing the facility to meet current standards is not financially feasible.  Further, there are six marinas in the immediate vicinity of Buzzard Point Marina, and another, Belle Haven Marina, approximately 5 miles downriver; therefore we no longer believe the service to be necessary and appropriate.  The NPS does not plan to issue a prospectus for a new service for Buzzard Point Marina, as based on this determination, the services is [sic] no longer necessary and appropriate.

AR 0089–91.

the agency considered – and then rejected – the possibility of contracting for future concessions operations at the site has no bearing on whether it was obligated by law to do so.  And plaintiffs' contention that the Park Service "mismanaged" Buzzard Point Marina by failing to require a franchise fee similarly does not provide a legal basis for the Court to find that the agency must, as plaintiffs insist, "repair the Marina and offer a financially viable concession contract."  *Id.* at 23. For those reasons, the Court finds that plaintiffs have failed to state a claim challenging the Park Service's contracting decision under the Concessions Act.

> **B.     The Park Service's decision not to solicit a new concessions contract for services at Buzzard Point is not reviewable under the APA.**

To the extent that plaintiffs also seek to attack the Park Service's compliance with the Concessions Act under the APA, that challenge also fails.  Plaintiffs appear to suggest that the Park Service acted arbitrarily and capriciously when it permitted the temporary concessions contract for marina services to expire without issuing a new prospectus soliciting future services at the site.  *See* Am. Compl. ¶ 84 ("[T]he Defendants' approval of the discontinuation of a concession for marina services and closure of Buzzard Point Marina . . . is arbitrary, capricious, and not in accordance with law, particularly 5 U.S.C. § 706(2)(a).").  And the APA does permit a court to set aside "agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

But the statute accords the Secretary unlimited discretion to determine whether to issue a concession contract, *see* 54 U.S.C. § 101913(10), and the APA does not apply to agency action committed to agency discretion by law.  5 U.S.C. § 701(a)(2).  While the Supreme Court has warned that this exception to the APA should be construed narrowly, *see Webster v. Doe*, 486 U.S. 592, 599 (1988) ("[S]ubsection (a)(2) applies 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'"), quoting *Volpe*, 401 U.S. at 410,

here the Court finds that the Concessions Act is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion" in determining whether a concessions contract should be awarded or not.  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).[4] The Park Service regulations that implement the Act also reflect the broad discretion accorded to the Park Service in this regard.  *See, e.g.*, 36 C.F.R. § 51.3 ("Visitor services means accommodations, facilities and services *determined by the Director* as necessary and appropriate for public use and enjoyment of a park area . . . .") (emphasis added).  Thus, the Park Service's decision not to solicit a new concessions contract for marina services at Buzzard Point was a matter "committed to agency discretion" that is not subject to review under the APA.  *See* 5 U.S.C. § 701(a)(2).

Plaintiffs also point to the provision within the APA that permits a court to "compel agency action unlawfully withheld" or unreasonably delayed.  Pls.' Post-Hr'g Suppl. at 9, quoting 5 U.S.C. § 706(1); *see also, e.g., Kaufman v. Mukasey,* 524 F.3d 1334, 1338 (D.C. Cir. 2008).  But the law

---

4        Plaintiffs cite several cases for the proposition that courts have "previously reviewed Concession Act claims according to the standards of the APA without suggesting that there are no meaningful standards."  Pls.' Post-Hr'g Suppl. at 6–8, citing *St. John Taxi Ass'n v. Norton*, 227 F. Supp. 2d 451 (D.V.I. 2002), *Amfac Resorts, LLC v. U.S. Dep't of Interior*, 142 F. Supp. 2d 54 (D.D.C. 2001), *Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6 (Fed. Cl. 2013), and *Mahon v. United States*, 795 F. Supp. 2d 149 (D. Mass. 2011).  But those cases are either not relevant or distinguishable:  *St. John Taxi Association* held that a Park Service plan to impose permitting fees on tour operators did not need to be set aside under the APA because the plan did not conflict with the Land and Water Conservation Fund Act of 1965, 227 F. Supp. 2d at 452, 453– 54; *Amfac Resorts* concluded that the Park Service did not violate 5 U.S.C. § 704 when it provided for an inter-agency appeal of a decision denying a concessioner a preferential right of renewal, 142 F. Supp. 2d at 77–78; *Eco Tour Adventures* dealt with a bidder's challenge to the Park Service's anticipated award of two concessions contracts to the plaintiff's competitors, based on how the Park Service conducted the bidding and proposal review process.  114 Fed. Cl. at 11–12; and *Mahon* arose under the Federal Tort Claims Act and involved the question of whether an agreement between the Park Service and a contractor constituted a concessions contract.  795 F. Supp. 2d at 151, 153–57.  Not one of these cases addressed whether an agency's decision not to solicit a new contract is reviewable under the Concessions Act or the APA.

is clear that the APA "insist[s] upon an 'agency action,' either as the action complained of . . . or as the action to be compelled." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  The Court has already determined that the Concessions Act did not require the Park Service to act in this case, and as discussed in greater detail below, a decision not to solicit a new contract is not an affirmative agency "action" or undertaking under NEPA or the NHPA.  So the contracting decision is not reviewable under this provision, either.[5]

For those reasons, the Court finds that plaintiffs have failed to state a cognizable claim challenging the Park Service's decision not to secure a new marina concessioner under either the Concessions Act or the APA, and defendant's motion to dismiss Count III will be granted.

### III.    The Park Service did not violate NEPA or the NHPA.

In Counts I and IV of the amended complaint, plaintiffs invoke NEPA and the NHPA to attack the Park Service's failure to enter into a new concessions contract to provide marina services after the current contract expires, its temporary closure of the marina thereafter, and "the destruction, if permitted," of the marina.  Am. Compl. ¶¶ 82–84, 95–96.  They contend that those

---

5       Furthermore, even if this aspect of the marina closure were reviewable under the APA, the Court doubts that the agency acted unreasonably in declining to solicit a new concessions contract for the marina.  "The court's role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003), quoting *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984).  The Court finds no statutory or regulatory violations here, as discussed in greater detail below, and the record supports a finding that the Park Service had a rational basis for its decision not to seek a new concessioner for the marina, because there is evidence that continued operations were not financially feasible without a significant investment in capital improvements and repair and maintenance to the marina infrastructure.  *See, e.g.*, AR 0091 ("We believe the cost of replacing the [Buzzard Point Marina] facility to meet current standards is not financially feasible."); AR 0099 (2013 inspection report noting that "[t]he floating docks . . . have some issues," including soft spots, rotting, and other safety hazards); AR 0244 (handwritten notes discussing "financial feasibility" of Buzzard Point prospectus); AR 0278–306 (2014 condition assessment listing docks as in "fair to poor condition"); AR 0338 (email discussing financial viability of combined contract covering operations at Buzzard Point and James Creek Marinas).

decisions must be examined together, as one comprehensive agency undertaking, and they maintain that the Park Service failed to comply with its obligations NEPA and the NHPA. *See, e.g.*, Pls.' Mem. at 18–19.

But these statutes do not afford plaintiffs relief at this stage. When the Park Service declined to procure a new concessions contract for services at the marina, it did not engage in an action or undertaking subject to either statute, and it did not improperly segment a major federal action or undertaking when it viewed that decision in isolation. And as documented in the Categorical Exclusion and the Assessment of Effects Forms, the Park Service complied with NEPA and the NHPA when it decided to close the marina temporarily. Finally, the Park Service has yet to undertake the relevant NEPA and NHPA analysis for, and has not irreversibly committed itself to, the permanent closure and destruction of Buzzard Point Marina, and so the question of the agency's compliance with those statutes with regard to those actions is not yet ripe for review.

**A.    The Park Service's decision not to solicit a new contract is not subject to NEPA or the NHPA because it was not an agency action or undertaking.**

At the heart of plaintiffs' multiple challenges to the Park Service's actions in this case is the decision not to solicit a new concessions contract for marina services at Buzzard Point. And as plaintiffs' counsel acknowledged during the hearing, plaintiffs cannot keep their boats in the slips at Buzzard Point without a concessioner to manage and operate the marina, no matter how the Court rules on plaintiffs' challenges to the other Park Service actions at issue. *See* Draft Hr'g Tr. 8:1–7, 10:7–9. But as the Court has already found, the Park Service's contracting decision is not subject to challenge under the Concessions Act or the APA, and it is similarly not reviewable under NEPA or the NHPA.

NEPA requires an agency to examine the environmental impact of any proposed "major federal action" prior to taking that action. *See* 42 U.S.C. § 4332(C). While the statute does not

define the term, the Code of Federal Regulations explains that "[f]ederal actions tend to fall within one of the following categories:   (1) Adoption of official policy . . . . (2) Adoption of formal plans . . . . (3) Adoption of programs . . . . [and] (4) Approval of specific projects."   40 C.F.R. § 1508.18(b)(1)–(4).   Thus, "an agency must undertake some overt act to trigger NEPA's requirements; the agency's mere refusal to exercise its statutory authority to act would not suffice." *Cross-Sound Ferry Servs., Inc. v. ICC*, 934 F.2d 327, 334 (D.C. Cir. 1991) (internal quotation marks omitted), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).   In other words, "NEPA applies only to agency *actions*, 'even if *inaction* has environmental consequences.'"   *All. for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 174–75 (D.D.C. 2000), quoting *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1243 (D.C. Cir. 1980).

Pursuant to that principle, the D.C. Circuit concluded in *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997), that a National Forest Service policy which left the regulation of game baiting on Forest System lands to the states involved "[did] not constitute a 'major federal action' triggering NEPA's [environmental impact statement] requirement."   *Id.* at 81, 83.   The Court also noted that "[t]he Forest Service's decision to refrain from future regulation of baiting may not constitute 'action' at all."   *Id.* at 83 n.3.   And in *International Center for Technology Assessment v. Thompson*, 421 F. Supp. 2d 1 (D.D.C. 2006), a court in this District similarly found that the FDA's decision "not to regulate [genetically modified fish] is not an agency action, but rather, an agency inaction" which did not require a NEPA analysis.   *Id.* at 9–10.

In keeping with these cases, the Court concludes that the Park Service's decision not to seek a new concessioner after the expiration of the temporary concessions contract is not an "action" subject to NEPA's environmental impact analysis requirements.   The Park Service did not cancel or prematurely terminate the temporary concession contract under which the marina

was being operated; the contract expired by its own terms on December 31, 2015.  AR 0001.  The agency therefore took no action that led to the contract expiration.  And the Park Service's decision to decline to exercise its authority to solicit a new concessions contract for marina services was an exercise of agency discretion, not an affirmative agency undertaking subject to NEPA or the NHPA.  *See, e.g.*, *Andrus*, 627 F.2d at 1244 ("[I]f the agency decides not to act, and thus not to present a proposal to act, the agency never reaches a point at which it need prepare an impact statement.").

This decision is consistent with the Ninth Circuit's recent opinion in *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014).  In *Drakes Bay*, the plaintiff challenged the Secretary of the Department of the Interior's "discretionary decision to let Drakes Bay's permit for commercial oyster farming expire according to its terms." *Id.* at 1077.  After the Secretary declined the plaintiff's request for an extension, Drakes Bay sought a preliminary injunction, arguing that the decision violated NEPA and various federal regulations.  *Id.* at 1077–78.  The plaintiff argued that "the Secretary's decision . . . effected a change in the status quo, namely, the cessation of commercial operations that had previously been authorized," and that it thus constituted a major federal action subject to NEPA.  *Id.* at 1089–90.  The Ninth Circuit rejected the plaintiff's position, expressing doubt that "the decision to allow the permit to expire after forty years . . . is a major action 'significantly affecting the quality of the human environment' to which NEPA applies." *Id.* at 1090, quoting 42 U.S.C. § 4332(C).[6]

Plaintiffs here similarly contend that the Park Service's failure to issue a new prospectus for marina services at Buzzard Point is an "abdication of the Park Service's responsibilities under

---

6       The Court went on to conclude that the agency had complied with its obligations under NEPA in any event. *Drakes Bay*, 747 F.3d at 1090–91.

the Concession Management Improvement Act" and that its decision therefore "cannot be viewed as 'inaction.'" Pls.' Mem. at 13. But the Concessions Act does not impose any affirmative duty on the Park Service to act, and it certainly did not require the agency to solicit a new concessions contract for Buzzard Point Marina. Plaintiffs also echo the argument that the Park Service deviated from the status quo when it declined to solicit a new contract for concessions services at the marina. *Id.* at 11–13. But the temporary concessions contract was set to expire by its own terms on December 31, 2015, AR 0001, and there is no legal authority for the proposition that because the Park Service contracted for concessions services at Buzzard Point in the past, it was required to do so in the future. For those reasons, the Court concludes that NEPA did not apply to this aspect of the Park Service's decision regarding the Buzzard Point Marina.

And for many of the same reasons, the Court also finds that the NHPA does not apply to the Park Service's decision not to issue a new prospectus. Like NEPA, the NHPA requires a federal agency to examine the impact of a potential federal action before undertaking it:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306108. From this statutory language, it is clear that "an agency need not satisfy the [NHPA] process at all . . . unless it is engaged in an undertaking." *McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 968 F.2d 1283, 1289 (D.C. Cir. 1992).

The NHPA defines an "undertaking" as:

> a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including –

(1) those carried out by or on behalf of the Federal agency;

(2) those carried out with Federal financial assistance;

(3) those requiring a Federal permit, license, or approval; and

(4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

54 U.S.C. § 300320. The statute therefore makes clear that "[a]n agency's failure to act, without more, is not an 'undertaking'" under the NHPA, *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 919 (D.D.C. 1996), and indeed, this is consistent with the plain meaning of the word.

"Because of the 'operational similarity' between NEPA and NHPA, both of which impose procedural obligations on federal agencies after a certain threshold of federal involvement, courts treat 'major federal actions' under NEPA similarly to 'federal undertakings' under NHPA." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295–96 (D.C. Cir. 2007), quoting *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir. 2001). So, just as the expiration of the marina contract without a further solicitation was not a major federal action subject to NEPA, it was also not a federal "undertaking" to which the NHPA applies.

For those reasons, the Court finds that the Park Service did not violate NEPA or the NHPA when it declined to seek out a new concessioner for marina services at Buzzard Point.[7]

B.    **The Park Service did not impermissibly segment its decision-making process to shield its actions from review under NEPA or the NHPA.**

Plaintiffs appear to recognize that the Park Service's decision not to solicit a new contract for marina services is not itself governed by NEPA or the NHPA. *See, e.g.*, Draft Hr'g Tr. 12:11–

---

7    Because the Court finds that the Park Service's contracting decision was not subject to NEPA or the NHPA at all, it need not reach defendants' contention that, given the financial infeasibility of continued marina operations, NEPA was not implicated because the Park Service was legally prohibited from awarding an unprofitable contract. *See* Defs.' Mem. at 10–11 ("NEPA compliance is triggered only when an agency has some discretion in making a decision.").

12 ("[N]ot renewing the contract . . . by itself does not violate NEPA.").  But they maintain that the agency's decision not to seek a new concessioner is nevertheless reviewable as part of the larger decision-making process relating to the closure and elimination of the marina, and they contend that defendants have improperly segmented their decisions to shield the overall effects of the marina closure from NEPA and NHPA review.  Pls.' Mem. at 9–10, 15, 18, 29–30; Pls.' Reply at 5–9.  Because the discontinuation of concessions services at the marina, the temporary closure of the site, and the planned removal of marina infrastructure are inextricably intertwined, plaintiffs argue, the Park Service's "NEPA analysis should have considered not just the 'temporary closure' but also the actions taken beforehand, namely ending concession services, and those taken during or after, namely the removal of the physical marina infrastructure."  Pls.' Mem. at 9; *see also id.* at 9–10, 15, 18, 29–30; Pls.' Reply at 5–9.

But plaintiffs misapply the segmentation doctrine.  The purpose of the non-segmentation requirement "is to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015), quoting *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988). There is no risk of that here:  the single "project" that might have a significant environmental or historical impact – the permanent closure of the marina and the removal of the marina infrastructure – will be subject to the applicable NEPA and NHPA analysis in its entirety, as the Park Service has assured the Court, and that project is independent of the decisions to forego a new contract and to temporarily close the marina in the absence of a concessioner.  While plaintiffs may object to defendants' treatment of each step in the process as a separate decision for regulatory purposes, their logical, sequential application of the various statutory and regulatory regimes

28

cannot be likened to the fragmentation of a single action in order to minimize its total environmental impact.

Furthermore, it is clear that the segmentation doctrine is not applicable to the key event in this case: the Park Service's decision not to solicit a new contract for marina services. "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "Connected actions" – those that "are closely related and therefore should be discussed in the same impact statement" – are actions that "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(i)–(iii). "Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts." *Id.* § 1508.25(a)(2). And finally, "[s]imilar actions" are those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id.* § 1508.25(a)(3).

The emphasis on "actions" in the relevant regulations indicates that, much like NEPA itself, the doctrine of segmentation applies only to agency actions, and not inaction. *See id.* § 1508.25(a); *see also All. for Bio-Integrity*, 116 F. Supp. 2d at 174–75. The Court has already determined that the expiration of the temporary concessions contract for Buzzard Point Marina by its own terms and the Park Service's decision not to issue a new prospectus for concessions services at the site

are not actions to which NEPA applies.  It therefore follows that those events cannot be the first of a series of "actions" to which the segmentation doctrine would arguably apply, either.

Plaintiffs also maintain that defendants should not be permitted to segment the actions taken with regard to Buzzard Point Marina because the Park Service's decision not to solicit a new marina contract resulted in the "irreversible and irretrievable commitments of resources to an action that will affect the environment" – namely, the ultimate removal of the marina infrastructure and the permanent closure of Buzzard Point Marina.  Pls.' Mem. at 14, quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999).  They maintain that through the Record of Determination, the Park Service "said in one single document we are not renewing the contract and we are going to temporarily close the marina and we are going to remove the infrastructure," Draft Hr'g Tr. 19:11–16, and that the entire decision-making process should therefore be subject to NEPA review.

But plaintiffs read too much into the documents memorializing the Park Service's decisions in this case, and they conflate several separate documents, each of which performs a specific function under a specific statute or regulation.  It is true that in the Record of Determination, the Park Service revealed its understanding that after the marina closes, "the park will begin removing marina-related infrastructure."  AR 0397.  But that document did not purport to conduct a NEPA or NHPA analysis for the infrastructure removal or for any other agency action; as will be discussed in the section related to 36 C.F.R. § 1.5 below, the Park Service issued the Record of Determination for the sole purpose of satisfying the obligations under its own regulations that were triggered by the temporary closure of the marina.  AR 0397.  The Record of Determination did not address or explain the need for a permanent closure or the removal of the marina infrastructure, and it did not irreversibly commit the Park Service to that course of action.  And nothing about the

temporary closure itself, which was necessitated by the absence of a concessioner to operate the facility and keep it safe, made the decision to remove the physical structures inevitable.

The same is true of the Categorical Exclusion Form and the Assessment of Effects Form, the documents that do contain the Park Service's NEPA and NHPA analyses.  Each document is limited on its face to justifying only the temporary closure of the Buzzard Point site, providing the following the "Project Description" in each case:

> The National Park Service (NPS) is proposing to temporarily close Buzzard Point Marina effective January 1, 2016.  A temporary closure is necessary because on December 31, 2015 the marina concession operations will be discontinued and the marina closed.  The temporary closure is necessary to ensure public health and safety while marina operations shut down, and to allow the park to assess the condition of resources and facilities, and to secure the area.  This will ensure public safety and resource protection.

AR 0392 (Categorical Exclusion Form); AR 0394 (Assessment of Effects Form).  As the forms make clear, the Park Service was only seeking to justify the decision to close the marina site temporarily; these documents were not meant to serve as the Park Service's NEPA or NHPA compliance for a permanent closure or the removal of the marina infrastructure, and they did not bind the Park Service to expending resources on those actions before it had examined the relevant environmental and historical impacts.

With regard to the final challenged actions in this case, the "destruction and closure, if permitted," of Buzzard Point Marina, Am. Compl. ¶ 83, plaintiffs are correct that the record does not contain a NEPA, NHPA, or other formal analysis for those undertakings.  And it is true that the Park Service has already informed the public of its intention to discontinue marina operations and remove the marina infrastructure from the site.  *See, e.g.*, AR 0385 (August 31, 2015 letter from National Park Service to plaintiff Jeffrey Aitken) ("Ceasing marina operations as historically provided was not a decision the NPS made lightly. . . . After the marina is closed, the NPS will

remove the docks, upgrade the boat ramp, and maintain the park area."); AR 0397 (Record of Determination) ("Once closed, the park will begin removing marina-related infrastructure . . . . [A]ll boat slip holders were advised that concession operations would be discontinued and the marina would be closed on December 31, 2015, [and] that no new concession contract prospectus would be advertised because the level of investment now needed for a marina concession was not financially feasible . . . .").

But the agency has not issued its formal decision in connection with those decisions. It has recognized that NEPA and the NHPA will apply to those actions, and it has assured the Court that it plans to conduct the required statutory analysis prior to undertaking them. *See, e.g.*, Defs.' Mot. to Dismiss at 4–5 (representing that the Park Service "may take future actions as to different uses for the marina and surrounding area, but it has not done so yet," and maintaining that it will "undertake a full planning process to consider options for future uses of the Buzzard Point Marina site, which will incorporate environmental analysis to the extent appropriate"); Decl. of Gopaul Noojibail [Dkt. # 47-2] ("Noojibail Decl.") ¶ 8 ("[T]he NPS determined that it was safer to remove the docks entirely as soon as possible. The NPS is committed to performing appropriate NEPA analysis for that planned action."); Draft Hr'g Tr. 29:13–15 ("We do certainly concede that some level of NEPA analysis will be required for pulling the docks out of the water."). And the letter the boat owners received also makes reference to a future planning process. *See* AR 0385 ("The NPS will begin planning efforts, which will include public involvement, to determine the recreational experiences and uses desired for the area by the community and the NPS. The goal is for people to continue to have recreational opportunities and access to the river and the park.").

So, based on the record before it and the Park Service's representations in its pleadings and at the hearing, the Court finds that the agency has not yet bound itself to "an 'irreversible and

irretrievable commitment of resources' to an action that will affect the environment," *All. for Bio-Integrity*, 116 F. Supp. 2d at 174, quoting *Wyo. Outdoor Council*, 165 F.3d at 49 – namely, the permanent closure of the marina and the removal of the infrastructure – in a way that would warrant review of those actions at this stage.

In other words, where, as here, "the 'possibility that further consideration will actually occur before [implementation] is not theoretical, but real,'" a claim is not ripe. *Wyo. Outdoor Council*, 165 F.3d at 50, quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998). And in this case, the Park Service has indicated that it is fully committed to undertaking the necessary consideration before implementing its plans to close the marina permanently and remove the infrastructure. The Court expects that it will do so, and to the extent that the Park Service does not fulfill its obligations in accordance with law, or its decision is not supported by the record, plaintiffs will have the opportunity to challenge that failure in court. But insofar as plaintiffs object to the permanent closure of Buzzard Point Marina and the removal of the existing marina infrastructure at this juncture, that decision is separate and severable from the other challenged actions in this case, and it is not ripe for review.[8]

   **C.    The Park Service properly determined that the temporary closure of Buzzard Point Marina was subject to a categorical exclusion under NEPA and the NHPA.**

The record does include a formal decision to close Buzzard Point temporarily. Defendants maintain that the temporary closure decision complied with NEPA and the NHPA because the

---

[8]    Even if the Court agreed with plaintiffs and found that the Park Service had moved forward to close the marina permanently and remove the docks without first examining the environmental or historical impact, it would still be unable to grant the relief that plaintiffs seek. The Court could remand the matter to the agency to undertake the NEPA and NHPA analyses, but it could not order the Park Service to solicit a new concessions contract to operate the facility in the interim, and therefore it could not reverse the Park Service's directive that marina patrons remove their boats while the site is temporarily closed.

Park Service determined that the action fell within the scope of a categorical exclusion ("CE") and that no environmental assessment was required.  Defs.' Mem. at 13–14.  That determination will be upheld.

> The Council on Environmental Quality regulations define a categorical exclusion as:

> > a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4.  Here, the Park Service "relied on documented Categorical Exclusion D.2, which includes '[m]inor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations,'" and defendants submit that the agency completed the required documentation to justify that decision.  Defs.' Mem. at 13, quoting NPS NEPA Handbook (2015) at 36, *available at* http://www.nps.gov/orgs/1812/ upload/NPS_NEPAHandbook_Final.pdf.

The agency prepared an Assessment of Actions Having an Effect on Historic Property for NHPA purposes, AR 0394–96, as well as a Categorical Exclusion Form which expressly incorporates the Assessment of Effects Form and applies the relevant exclusion under NEPA.  AR 0392–93; *see also* AR 0398–99 (November 23, 2015 Environmental Screening Form referred to in the Categorical Exclusion Form, which finds that no exceptional circumstances apply to the temporary closure under Categorical Exclusion D.2).  All of these documents state clearly that they apply only to the temporary closure. *See* AR 0392–96; AR 0398–99.

The D.C. Circuit has held that "traditional arbitrary-and-capricious review is sufficient where the question is whether the [agency] properly invoked a CE."  *Nat'l Trust for Historic Preservation in the U.S. v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987).  "[T]he agency's

interpretation of the scope of one of its own CE's is 'given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006), quoting *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999).

Applying that deferential standard, the Court will not disturb the Park Service's determination in this case that the temporary marina closure was subject to NEPA Categorical Exclusion D.2 and did not offend the NHPA.  The Assessment of Effects Form states:

> The temporary closure is necessary to ensure public health and safety while marina operations shut down, and to allow the park to assess the condition of resources and facilities and to secure the area.  This will ensure public safety and resource protection.

AR 0394.  The document explores whether there is any possibility of uncovering archeological resources at Buzzard Point, as well as whether the location encompasses or abuts any other historic properties.  AR 0394–96.  The Park Service reports on the form that the proposed action will not destroy, disturb, or alter any historic structures, or archeological, ethnographic, or cultural resources, and it specifically addresses the historic significance, if any, of the site:

> There are no properties at the marina within the List of Classified Structures, and the existing docks and marina-infrastructure are less than 50 years old.  The Buzzard Point marina itself has not been determined eligible for listing or identified as a historic property, and at this point is an unevaluated resource.

AR 0395.  Based on all of those factors, the Park Service concluded that the temporary closure had "no potential to cause effects," AR 0396, and the Court finds that decision to be reasonable.

The Categorical Exclusion Form prepared for NEPA purposes states that "on December 31, 2015, the marina concession operations will be discontinued and the marina closed," and it repeats that under those circumstances, the temporary closure of Buzzard Point is necessary to secure the area while the park assesses the condition of the facilities.  AR 0392.  In light of the

deteriorating condition of the marina docks and the fact that there would no longer be a concessioner to oversee safety and security at the site, it was reasonable for the Park Service to conclude that a temporary closure was necessary to "ensure public safety and resource protection." AR 0392.

The Categorical Exclusion Form expressly incorporates the Assessment of Effects Form, AR 0392 ("This categorical exclusion is not valid without the approved Assessment of Effect documentation."), and it states that the exclusion is also predicated on environmental impact information in the statutory compliance file, which is included in the Administrative Record. *See* AR 0398–99. This form reflects that the Park Service considered a number of factors in determining that no extraordinary circumstances applied, such as whether the temporary closure would have significant, controversial, or uncertain impacts on a variety of issues, including public health and safety, natural, historic and cultural resources, the environment, historic properties, unique geographic resources, endangered species, or low income and minority populations. AR 0398–99. Based on this record, and the fact that the findings did not purport to justify anything more than the temporary closure of the facility, the application of Categorical Exclusion D.2 – "minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection" – was reasonable.

Plaintiffs argue that the Park Service improperly applied the relevant categorical exclusion to its decision because "[e]nding marina services entirely and removing physical infrastructure is not a minor change." Pls.' Mem. at 16. They also maintain that "the Marina closure is an Extraordinary Circumstance making an exclusion inapplicable." *Id.* at 17. But once again, plaintiffs conflate the only decision the agency has analyzed under the regulatory framework to date with the future removal of the infrastructure and a permanent closure of the marina. Both the

Categorical Exclusion Form and the Assessment of Effects Form are plainly constrained by their terms to apply to the temporary closure of the marina only.  AR 0392; AR 0394.  Since those determinations do not purport to authorize or justify the removal of the docks or the permanent closure of the facility, and the agency has acknowledged that further statutory and regulatory compliance will be necessary before any work is undertaken, *see, e.g.*, Defs.' Mot. to Dismiss at 4–5; Noojibail Decl. ¶ 8; Draft Hr'g Tr. 29:13–15, the limited application of the Categorical Exclusion to the temporary closure was reasonable and will not be disturbed.

Plaintiffs also appear to take issue with the timing of the preparation of the Categorical Exclusion Form and the Assessment of Effects Form in relation to the Record of Determination, *see* Pls.' Mem. at 9, but these documents were created to comply with separate and unrelated statutory and regulatory obligations.  The fact that the Categorical Exclusion and the Assessment of Effects Forms, which satisfied the Park Service's obligations under NEPA and NHPA, were prepared after the Record of Determination, which fulfilled the agency's duties under 36 C.F.R. § 1.5, has no bearing on the validity of any of those documents or the agency's decision to close the marina site temporarily.

For those reasons, the Court finds that the Park Service complied with its obligations under NEPA and the NHPA in applying a categorical exclusion to its decision to close the Buzzard Point Marina temporarily.  Defendants are therefore entitled to summary judgment on Counts I and IV of the amended complaint.

**IV.    The Park Service complied with its obligations under 36 C.F.R. §§ 1.5 and 1.7, and it did not act arbitrarily and capriciously in violation of the APA.**

In Count II, plaintiffs allege that the Park Service violated the APA when it failed to publish its decision to close Buzzard Point Marina in the Federal Register, in accordance with 36 C.F.R. §§ 1.5 and 1.7.  Am. Compl. ¶ 85.  Defendants respond that the Park Service reasonably applied

its own regulations to determine that a rulemaking was not necessary in advance of the temporary

closure, which was adequately supported in the Record of Determination.  Defs.' Mem. at 14–16.

Since once again, the determination under review addressed only the level of regulatory

compliance that would attend the temporary closure, and the agency has not yet issued its decision

evaluating the removal of the docks or the permanent cessation of marina activities under 36 C.F.R.

§ 1.5, the Court finds no violation of the regulations that would be actionable under the APA.

Pursuant to Park Service regulations, the Park Service "may:"

> based upon a determination that such action is necessary for the
> maintenance of public health and safety, protection of environmental or
> scenic values, . . . implementation of management responsibilities, [or]
> equitable allocation and use of facilities, . . . impose public use limits, or
> close all or a portion of a park area to all public use or to a specific public
> use.

36 C.F.R. § 1.5(a)(1).  But there are procedures to be followed in the exercise of this discretion.

Section 1.5(c) requires that prior to implementing a public use limit or closure, "the superintendent

shall prepare a written determination justifying the action," and section 1.5(b) provides:

> Except in emergency situations, a closure . . . [or] use or activity
> restriction . . . which is of a nature, magnitude and duration that [it] will
> result in a significant alteration in the public use pattern of the park area,
> adversely affect the park's natural, aesthetic, scenic or cultural values,
> require a long-term or significant modification in the resource management
> objectives of the unit, or is of a highly controversial nature, shall be
> published in the Federal Register.

*Id.* § 1.5(b).

In this case, the Park Service prepared a written Record of Determination justifying the

temporary closure, which explains:

> The closure is not of a nature, magnitude and duration that will result in a
> "significant alteration in the public use pattern" because of the limited
> duration of the closure, that other nearby park areas in National Capital

Parks-East will remain open, as well as because other adjacent marinas are open to the public and available to boaters.

AR 0397.  The Record of Determination also includes the conclusion that:

The temporary closure of the marina does not constitute impairment to park resources and values and will not adversely affect the park's natural, aesthetic or cultural values.  It does not require significant modification to the resource management objectives.  It is also not of a highly controversial nature because of the temporary nature of the closure and that other alternative marinas exist nearby.

AR 0397.  Based on those findings, the Park Service "determine[d] that publication as rulemaking in the Federal Register is unwarranted under 36 CFR 1.5(c)," a conclusion which the Park Service pronounced to be "consistent with National Capital Parks-East's past partial and temporary park closures, the legal opinion of the Office of the Solicitor, and past judicial adjudications."  AR 0397.

"An agency's interpretation of its own regulation merits even greater deference than its interpretation of the statute that it administers."  *Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F.3d 125, 128 (D.C. Cir. 1999), citing *Bush-Quayle Primary Comm., Inc., v. FEC*, 104 F.3d 448, 452 (D.C. Cir. 1997) ("The call for deference is even greater where the agency is interpreting its own regulations.").  Here, the Court finds that the Park Service acted reasonably in determining that section 1.5(b) did not require publication of the temporary closure decision in the Federal Register because the closure was not "of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area."  36 C.F.R. § 1.5(b).  The closure was expressly characterized as "temporary" in nature, AR 0397, and the Park Service appropriately considered the fact that "there are six marinas in the immediate vicinity of Buzzard Point Marina, and another . . . approximately 5 miles downriver," AR 0091, providing for continued use of the Anacostia and Potomac waterways in the area surrounding Buzzard Point.

Another court in this District came to a similar conclusion in a case involving a Park Service restriction on overnight docking at Washington Harbor.  In *Spiegel v. Babbit*, 855 F. Supp. 402 (D.D.C. 1994), *aff'd in part and vacated in part on other grounds* 56 F.3d 1531 (D.C. Cir. 1995), the court found that publication of the overnight docking limitation as a rulemaking in the Federal Register was not necessary because it affected "only a small number of boat owners" and "only occasionally during a few summer months," and therefore did not constitute "a 'significant alteration' in the public use pattern of the park."  *Id.* at 404.  The court also found the stated justification for the restriction – to ensure "the maintenance of public health and safety, protection of environmental or scenic values, [and] protection of natural or cultural resources" – to be sufficient to satisfy the requirements of 36 C.F.R. § 1.5(c), particularly given the Park Service's observation that the harbor "was never intended nor was it ever designated . . . to be used for overnight accommodations."  *Id.* at 403.

Here, as in *Babbit*, the marina closure affects "only a small number of boat owners" who dock their boats at a particular location, and it does not restrict anyone's opportunity to boat or sail in the adjoining waters in any way.  And given the temporary nature of the action, the agency reasonably concluded under section 1.5(b) that the closure would not significantly affect park use.

Plaintiffs maintain that permanently changing the use of Buzzard Point from a marina to another park use is "a significant alteration in the public use pattern of the park area" which requires publication as a rulemaking in the Federal Register under 36 C.F.R. § 1.5(b). Am. Compl. ¶ 85; Pls.' Post-Hr'g Suppl. at 11–12.  They complain that they were denied the opportunity to comment during a formal rulemaking process, but their attack on the Park Service's compliance with section 1.5(b), like their other arguments, blends the temporary closure decision with the permanent closure of the marina and the removal of the marina infrastructure.  *See* Am. Compl.

¶ 85 ("The impact of the Park Service actions, if permitted, will eliminate 90 boat slip[s] and cause existing lessees of the Buzzard Point Marina boat slips to permanently remove their boats. These circumstances require publication in the Federal Register."); Pls.' Post-Hr'g Suppl. at 11 ("Defendants' failure to comply with [36 C.F.R. § 1.5] as it relates to the elimination of the 90 boat slips, or the termination of the boat slip leases or eviction from Buzzard Point Marina or the legal consequences of a failure to comply with Defendants['] decision and orders violated the APA.").

There is no question that the Record of Determination does not adequately support a permanent decision to discontinue the longstanding use of the site as a marina, and it does not engage in the necessary analysis of whether the notice and comment obligation would attach to such a decision. But it was not intended to do so. The Park Service will have to undertake the analysis required by section 1.5(b) if and when it decides to alter the use pattern for Buzzard Point Marina permanently, including by removing the marina infrastructure. Plaintiffs are united and emphatic in their desire to have a voice in the planning process, but there has been no failure to comply with the regulations to date, and the question of whether a rulemaking will be required with regard to a permanent closure is not ripe.[9] The Court expresses no opinion at this time on the question of whether the contemplated future actions will trigger the notice and comment requirement in the regulations; no record has been developed, and no formal decision has been issued to review.

---

9       The Court recognizes that it is plaintiffs' position that a public discussion should have taken place before the Park Service let the concessioner go, but there has not yet been a determination as to whether the notice and comment requirement applies to a permanent closure of the marina, and the Court cannot force the government to continue to contract with a concessioner in any event. If the end result of whatever process ensues is that some marina operations should resume, nothing that has been decided in this case will act as a bar to a solicitation for a new contract.

Plaintiffs also allege in the amended complaint that the Park Service failed to comply with 36 C.F.R. § 1.7, Am. Compl. ¶ 85, but they do not elaborate further on that contention. That section requires the agency to notify the public through signs, maps, publication in a newspaper, or other appropriate methods when it alters a park use or activity pursuant to section 1.5(a). 36 C.F.R. § 1.7(a). But the Record of Determination states that "notice of this temporary closure will be park announcements and the posting of signs at conspicuous locations along the existing fence line as well along the water line to alert boaters." AR 0397. Plaintiffs do not argue that the regulations call for the signage before the closure goes into effect on March 1, 2016, and the record shows that plaintiffs, at least, were notified well in advance of the temporary closure. *See* AR 0385–90 (August 31, 2015 letter to marina patrons explaining that "effective December 31, 2015, slip rental and marina concession operations at the Buzzard Point Marina will be discontinued and the marina will be closed"). And there has been public notification through the Park Service website. *See also* National Park Service, "Buzzard Point Marina closing; NPS to engage community to determine area's future" (Sept. 3, 2015), *available at* http://www.nps.gov/anac/learn/news/buzzard-point-marina-closing.htm. Therefore, there is no basis to find a violation of the notice requirements of 36 C.F.R. § 1.7 at this time.

Finally, because the Court has determined that the Park Service fulfilled its regulatory obligations with regard to the temporary closure, and that it was not required to publish notice of its action in the Federal Register, it also concludes that the agency did not act arbitrarily and capriciously or unlawfully withhold action in violation of the APA in this regard. *See* 5 U.S.C. § 706. Therefore, defendants are entitled to summary judgment on Count II of the amended complaint.

## CONCLUSION

The Court finds that NEPA and the NHPA did not apply to the Park Service's decision to let the Buzzard Point Marina concession contract expire without soliciting a new contract, and that the agency's exercise of its discretion to do so is not reviewable under either the Concessions Act or the APA.  It further concludes that a NEPA categorical exclusion applied to the decision to close the site temporarily in the absence of a concessioner, and that the agency's determination that a rulemaking was not necessary under 36 C.F.R. § 1.5(b) to take that step is entitled to deference. The Park Service has assured the Court that notwithstanding the broad statements contained in its public communications about what will happen next, the only action that will be undertaken is the only action that has been specifically justified in the record under NEPA, the NHPA, and 36 C.F.R. § 1.5 – the temporary closure – and that any removal of physical structures or permanent elimination of the public use of site as a marina will await the completion of the appropriate analysis under all applicable statutes and regulations.  Any review of that analysis now would be premature.

For those reasons, the Court will deny plaintiffs' motion for summary judgment, grant defendants' motion to dismiss Count III, and grant defendants' motion for summary judgment on Counts I, II, and IV.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 26, 2016